**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0123-23

JAMES PIEPER,

     Plaintiff-Appellant,

v.

NEW JERSEY JUVENILE
JUSTICE COMMISSION,

     Defendant-Respondent.

_____

Submitted February 4, 2025 – Decided June 26, 2025

Before Judges Susswein and Perez Friscia.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-1193-18.

O'Connor, Parsons, Lane & Noble, LLC, attorneys for appellant (Gregory Brian Noble, of counsel; Robert A. Ballard III and Jessica Y. Ma, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Azeem M. Chaudry and Leo R. Boerstoel, Deputy Attorneys General, on the brief).

PER CURIAM

Plaintiff James Pieper, a former corrections officer, appeals from the August 30, 2023 Law Division order granting defendant New Jersey Juvenile Justice Commission (JJC) summary judgment and dismissing plaintiff's claims of discrimination and retaliation under the New Jersey Law Against Discrimination Act (LAD), N.J.S.A. 10:5-1 to -50. Having reviewed the record in light of the parties' arguments and governing legal principles, we affirm.

I.

We discern the following pertinent facts and procedural history from the record. Plaintiff began working for the JJC in 2002, eventually becoming a Senior Corrections Officer (SCO).

In 2012, plaintiff sustained an injury on the job, left his JJC employment, and filed for disability retirement. After his disability retirement request was denied, plaintiff requested reinstatement at JJC. In a letter dated May 9, 2014, defendant advised plaintiff that "due to your resignation . . . there is no position to be reinstated to" thus plaintiff would need to "complete[] [an] application for reemployment."

On July 17, 2014, plaintiff filed a lawsuit against defendant alleging disability discrimination. On February 23, 2015, plaintiff was reinstated to his

2

A-0123-23

SCO position after completing the application for reemployment. On October 28, the parties settled plaintiff's lawsuit for $225,000.

In early 2016, plaintiff also filed two worker's compensation claims—one successful and one unsuccessful—related to separate work-related injuries. In March and June 2016, plaintiff applied for leave twice due to mental health diagnoses, which defendant granted in June. In June 2016, plaintiff was admitted to Princeton Behavioral Health inpatient facility.

On July 3, 2016 around 2:00 a.m., plaintiff was involved in a motor vehicle accident. Kenilworth Police Officers and New Jersey State Troopers responded. At the scene, plaintiff told the State Troopers that he had left a bar and did not know how much alcohol he had consumed. After refusing a field sobriety test, plaintiff stated "I'm a cop, by the way." While being placed in back of the State Trooper's car, plaintiff stated, "you[] cost me my career, put me in with someone whose gonna kill me tonight, that's what I want."

State Troopers then advised plaintiff of his Miranda[1] rights, and plaintiff repeatedly responded, "suck a d[***][,]" "f[***] you[,]" and other derogatory remarks. Plaintiff then asked the State Trooper why he "smashed [defendant's] car." Plaintiff twice stated, "I'm gonna kill somebody tonight" and used a

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

A-0123-23

homophobic slur several times. He told the State Troopers that "I'm [gonna] tell [] you[ a]re abusing me, right now[,]" and that he was going to "have" the State Troopers' badges. He stated, "come on, come beat me up, open the door."

Plaintiff also claimed that a New Jersey State Assemblyman was his uncle and repeatedly asked the State Troopers to call him. Plaintiff stated "ask [the Assemblyman] who the f[***] I am, ask [the New Jersey Governor] who the f[***] I am, come on, ask him . . . you know I'm a State f[***]ing Trooper, and you're [gonna] do this to me? . . . tell me I won't have both your motherf[***]ing heads."

In addition to making several more statements while the State Troopers were transporting him, plaintiff began screaming, "[o]w, why are you doing this to me, get off me now, [inaudible] you punched me in the face, pull over."

Plaintiff was charged with fourth-degree throwing bodily fluids, N.J.S.A. 2C:12-13; third-degree terroristic threats, N.J.S.A. 2C:12-3(a); a disorderly persons offense of simple assault with a motor vehicle, N.J.S.A. 2C:12-1(a)(1); and a disorderly persons offense of criminal mischief, N.J.S.A. 2C:17-3(a)(1).

On July 5, 2016, the JJC issued a Preliminary Notice of Disciplinary Action charging plaintiff with Conduct Unbecoming a Public Employee, N.J.A.C. 4A:2-2.3(a)(6), and Other Sufficient Causes, N.J.A.C. 4A:2-

2.3(a)(12). Plaintiff was placed on an indefinite suspension with pay pending resolution of the criminal charges.

A pre-termination hearing was convened on July 7, 2016. Plaintiff did not appear but another SCO appeared as plaintiff's employee representative. As a result of the hearing, plaintiff was issued a second Preliminary Notice of Disciplinary Action stating that he was suspended without pay.

On June 2, 2017, plaintiff completed the Pre-Trial Intervention Program and the criminal charges were dismissed. As part of his program, plaintiff also reported to his probation officer that he had used benzodiazepines, cocaine, and alcohol in 2015.

After the JJC investigated the July 3, 2016 incident, JJC issued a third Preliminary Notice of Disciplinary Action to plaintiff on July 14, 2017. It stated that plaintiff was subject to removal, rather than suspension, and his conduct on July 3 was justification.

Plaintiff requested a Departmental Disciplinary hearing, which was convened on March 12 and May 30, 2018. At the hearing, a JJC special investigator testified and dash camera footage from the July 3, 2016 incident was played. Chief Hearing Officer Phillip Dowdell determined that "there was just and sufficient cause for management to discipline [plaintiff] for the

A-0123-23

[N.J.A.C. 4A:2-2.3(a)(6) and (12)] charges and specifications relating to his actions with the [State Troopers] and Kenilworth police officer and remove him from employment with the JJC."

On June 26, 2018, defendant issued a Final Notice of Disciplinary Action to plaintiff stating he would be removed, effective July 8, 2016.

On March 29, 2018, plaintiff filed a complaint against defendant for disability discrimination in violation of the LAD, retaliation in violation of the LAD, and workers' compensation retaliation. Five years later on March 17, 2023, defendant filed a motion for summary judgment, which plaintiff opposed. Oral argument was held on August 9, 2023. On August 30, the trial court granted defendant's motion, dismissing plaintiff's complaint with prejudice and without costs.

This appeal followed. Plaintiff contends that there are numerous disputed facts that preclude summary judgment. Further, plaintiff argues that the trial court erred in finding that he failed to establish a prima facie case of disability discrimination and retaliation under the LAD. With respect to the retaliation LAD claim, plaintiff contends that sufficient evidence exists to demonstrate a temporal proximity between his prior lawsuit and his ultimate termination, and

that evidence of the disparate treatment demonstrates antagonism and retaliatory animus. He also argues that a jury must decide his punitive damages claim.

Defendant responds that the trial court properly granted summary judgment because there is no dispute of material fact concerning plaintiff's disability discrimination and retaliation claims because plaintiff's egregious conduct, by itself, justified his termination. Further, defendant argues that the court properly found that plaintiff failed to present a prima facie case for any of his LAD claims and that it had legitimate, non-discriminatory and non-retaliatory reasons for terminating plaintiff.

II.

We begin our analysis by acknowledging the legal principles governing this appeal. We review a trial court's summary judgment decision de novo. Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021). "The court's function is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Rios v. Meda Pharm., Inc., 247 N.J. 1, 13 (2021) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)). "To decide whether a genuine issue of material fact exists, the trial court must 'draw[] all legitimate inferences from the facts in favor of the non-moving party.'" Friedman v. Martinez, 242 N.J. 449, 472

7

(2020) (alterations in original) (quoting Globe Motor Co. v. Igdalev, 225 N.J. 469, 480 (2016)). However, "a non-moving party cannot defeat a motion for summary judgment merely by pointing to any fact in dispute." Brill, 142 N.J. at 529. The key inquiry is whether the evidence presented, when viewed in the light most favorable to the non-moving party, "[is] sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Id. at 540. Brill further instructs that if the evidence in the record is "so one-sided that one party must prevail as a matter of law . . . the trial court should not hesitate to grant summary judgment." Ibid. (citation omitted).

Turning to substantive legal principles, the LAD was enacted "for the protection of the public safety, health and morals and to promote the general welfare and in fulfillment of the provisions of the Constitution of this State guaranteeing civil rights." N.J.S.A. 10:5-2. To establish a case of discrimination under the LAD, "an employee must 'show that the prohibited consideration . . . played a role in the decision-making process and that it had a determinative influence on the outcome of that process.'" Bergen Com. Bank v. Sisler, 157 N.J. 188, 207 (1999) (quoting Maiorino v. Schering-Plough Corp., 302 N.J. Super. 323, 344 (App. Div. 1997)). For employment discrimination based on circumstantial evidence, New Jersey courts have adopted the burden-

shifting analytical framework established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>Viscik v. Fowler Equip. Co.</u>, 173 N.J. 1, 13-14 (2002).

To assert a prima facie case of discrimination, plaintiffs must show that: (1) they were members of a protected group; (2) their job performance met their employer's legitimate expectations; (3) they were terminated; and (4) the employer replaced or sought to replace them. <u>Nini v. Mercer Cnty. Cmty. Coll.</u>, 406 N.J. Super. 547, 554 (App. Div. 2009) (citing <u>Zive v. Stanley Roberts, Inc.</u>, 182 N.J. 436, 450 (2005)). "The evidentiary burden at the prima facie stage is 'rather modest: it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent—i.e., that discrimination <u>could</u> be a reason for the employer's action.'" <u>Zive</u>, 182 N.J. at 447 (quoting <u>Marzano v. Comput. Sci. Corp.</u>, 91 F.3d 497, 508 (3d Cir. 1996)).

The second prong of a prima facie case—the plaintiff's job performance met their employer's legitimate expectations—is an objective standard. <u>Viscik</u>, 173 N.J. at 21. To meet the second prong, "[a]ll that is necessary is that the plaintiff produce evidence showing that [they were] actually performing the job prior to the termination." <u>Zive</u>, 182 N.J. at 454. That is "not a heavy burden

nor was it meant to be." Id. at 455. However, "[s]imple proof of continued employment is not enough." Ibid.

Though not binding,[2] we find further guidance in Guarneri v. Buckeye Pipe Line Servs. Co., where the district court defined an "objective" assessment of the employer's legitimate expectations as "based on criteria in the areas of productivity, output, and efficiency." 205 F. Supp. 3d 606, 615-16 (D.N.J. 2016) (citing Weldon v. Kraft, Inc., 896 F.2d 793, 799 (3rd Cir. 1990)). Subjective criteria include "broad, general terms such as 'effort,' 'initiative,' and 'sense of priorities.'" Id. at 616 (quoting Weldon, 896 F.2d at 799).

If a plaintiff presents a prima facie case under the McDonnell framework, the defendant must then offer a legitimate, non-discriminatory reason for the action. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000). Once the employer produces sufficient evidence to support a non-discriminatory explanation for its decision, it becomes the plaintiff's burden under the McDonnell test to persuade the jury that the employer's asserted business reasons were only a pretext for discrimination. Id. at 143.

---

[2] "It is well-settled law in New Jersey that our state courts, in interpreting LAD, should look to federal anti-discrimination cases 'as a key source of interpretive authority.'" Jones v. Aluminum Shapes, Inc., 339 N.J. Super. 412, 421-22 (App. Div. 2001) (quoting Grigoletti v. Ortho Pharmaceutical Corp., 118 N.J. 89, 97 (1990)).

A-0123-23

We next briefly summarize the statutory criteria for an LAD retaliation claim. The prima facie elements are: "(1) plaintiff was in a protected class; (2) plaintiff engaged in protected activity known to the employer; (3) plaintiff was thereafter subjected to an adverse employment consequence; and (4) that there is a causal link between the protected activity and the adverse employment consequence." Victor v. State, 203 N.J. 383, 409 (citing Woods-Pirozzi v. Nabisco Foods, 290 N.J. Super. 252, 274 (App. Div. 1996)).

For the fourth prong, a "causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive." Romano v. Brown & Williamson Tobacco Corp., 284 N.J. Super. 543, 550 (App. Div. 1995). "However, 'the mere fact that [an] adverse employment action occurs after [the protected activity] will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two.'" Young v. Hobart W. Grp., 385 N.J. Super. 448, 467 (App. Div. 2005) (quotation marks omitted) (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997)). "Only where the facts of the particular case are so 'unusually suggestive of retaliatory motive' may temporal proximity, on its own, support an inference of causation." Ibid. (quoting Krouse, 126 F.3d at 503).

However, "[w]here the timing alone is not 'unusually suggestive, the plaintiff must set forth other evidence to establish the causal link." Ibid. Other evidence can include a pattern of antagonism or pretext. Cohen v. BH Media Grp., Inc., 419 F. Supp. 3d 831, 856 (D.N.J. 2019).

Once a prima facie case is established, the burden of proof shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse action. Jamison v. Rockaway Twp. Bd. of Educ., 242 N.J. Super. 436, 445 (App. Div. 1990). If the defendant succeeds, the plaintiff must show, by a preponderance of the evidence, that a discriminatory intent motivated the defendant's action by either proving the articulated reason is a pretext for the retaliation or proving a discriminatory reason more likely motivated the employer. Ibid. (citing Texas Dep't. of Cmty Aff. v. Burdine, 450 U.S. 248, 256 (1981)). If the plaintiff succeeds, the defendant must prove the adverse action would have been taken regardless of retaliatory intent. Id. at 446.

### III.

We next apply these general principles to the present record. Plaintiff argues the trial court erred in dismissing his disability discrimination claim because the court incorrectly relied on a subjective assessment of plaintiff's behavior on July 3, 2016 in finding that defendant had not met prong two of the

12

prima facie case test. Plaintiff relies on <u>Zive</u> for the proposition that the trial court may not consider "any argument regarding [p]laintiff's poor performance" until the prima facie case is established and the burden shifts to the defendant under <u>McDonnell</u>.

We are unpersuaded. The record supports the trial court's determination that plaintiff's termination was the result of his conduct during the July 3, 2016 incident. In reaching its conclusion, the trial court properly relied on the undisputed and objective fact that plaintiff's conduct during the July 3, 2016 incident violated several employment policies.

Plaintiff ultimately fails to present a genuine issue of material fact with regard to the <u>McDonnell</u> burden-shifting analysis. Defendant presents three main reasons for termination: plaintiff's violation of JJC's standards of conduct based on his actions on July 3, 2016, plaintiff's violation of JJC's policy barring exploitation of a state position based on his actions on July 3, 2016, and plaintiff's violation of JJC's drug use policy.

It is undisputed that during plaintiff's employment, he signed and acknowledged several JJC's policies, including the Drug Testing Recruit Notice and Acknowledgement, the Code of Ethics/Ethics Guide, the Work-Related

13

Standards of Conduct policy, the Drug Free Workplace policy, and the Policy Prohibiting Discrimination, Harassment, or Hostile Work Environment.

During the July 3, 2016 incident, plaintiff threatened the lives of State Troopers, repeatedly used a homophobic slur towards them, and falsely claimed that he was a State Trooper and the nephew of a New Jersey State Assemblyman, then insinuated that immunized him from arrest. In addition to facing four criminal charges, plaintiff was issued a Preliminary Notice of Disciplinary Action charging him with Conduct Unbecoming a Public Employee, N.J.A.C. 4A:2-2.3(a)(6), and Other Sufficient Causes, N.J.A.C. 4A:2-2.3(a)(12). Further, during the course of the PTI program, plaintiff admitted to using benzodiazepines and cocaine in 2015. In these circumstances, we satisfied that his LAD discrimination claim cannot survive the McDonnell burden-shifting analysis.

IV.

We reach a similar conclusion with respect to the trial court's summary judgment dismissal of plaintiff's LAD retaliation claim that is based on his 2014 lawsuit against JJC. Plaintiff argues the trial court erred in finding he failed to establish the causation prong of his prima facie retaliation claim. We disagree.

A-0123-23

As we have explained, the fourth element of a retaliation claim requires a causal connection. Plaintiff's prior lawsuit was filed on July 17, 2014 and settled on October 28, 2015. After the July 3, 2016 incident, plaintiff was indefinitely suspended on July 5, 2016. He was permanently removed on June 26, 2018, effective July 8, 2016. In sum, plaintiff was formally terminated two years after he first filed this lawsuit, and four years after his 2014 lawsuit. The time between his settlement and his termination was two years and seven months. Without other evidence, that is not enough to establish causation. See Young, 385 N.J. Super. at 467.

A.

Relatedly, plaintiff contends the trial court failed to appreciate the other evidence in the record from which a jury can infer retaliatory intent. Specifically, plaintiff contends that defendant engaged in disparate treatment of similarly situated employees and mishandled his termination by failing to consider his disability as a mitigating factor.

After reviewing the record and the trial court's well-supported findings, we are unpersuaded that there was a pattern of disparate treatment of similarly situated JJC employees. Plaintiff points to other JJC employees who were charged with Conduct Unbecoming a Public Employee but who were not

15

terminated. As the trial court found, those cases are distinguishable. Here, plaintiff threatened the lives of State Troopers, repeatedly used derogatory language, attempted to use his public position for a personal benefit, and falsely asserted that he was a State Trooper. In the other cases, three of the JJC employees did not threaten the lives of others, use derogatory language, or leverage their public positions for benefit. While the fourth JJC employee did threaten the life of another person, they did not use derogatory language or use their governmental position to gain an improper benefit. The fifth JJC employee threatened two people and attempted to use their public position for their benefit, but did not use derogatory language or falsely claim to be a State Trooper. Therefore, the alleged disparate treatment is not enough to establish a causal connection for purposes of the fourth prong of a retaliation claim.

V.

We next address plaintiff's contention that testimony from other JJC employees about his termination demonstrates antagonism and retaliatory animus related to both his discrimination and retaliation claims. We are not persuaded by plaintiff's contention that defendant failed to consider his disability as a mitigating factor in imposing discipline.

16

JJC employees testified that an employee's prior mental health and substance abuse issues are relevant as mitigating factors in determining discipline. For example, Kevin Brown, JJC Executive Director at the time of plaintiff's termination, testified in his deposition that, "my general understanding . . . is that [psychiatric and substance abuse problems] should be taken into consideration" when determining the proper level of discipline for an employee.

Felix Micken, also a JJC Deputy Executive Director at the time of plaintiff's termination, testified that an employee's medical condition "could be" a mitigating factor in determining disciplinary action. Josie Piccolella, JJC Director of Human Resources at the time of plaintiff's termination, testified that disciplinary "decision makers would have to be advised" of an employee's "medical situation." Dolores Harrison, JJC Supervisor of the Leave Unit at the time of plaintiff's termination, testified that she provided medical leave reports to Mickens. She also testified that she received a letter from Princeton House Behavioral Health dated July 18, 2016 about plaintiff going on ten days of leave. She did not mention the letter to anyone but "could see how it could have a bearing" on plaintiff's disciplinary matter.

 A-0123-23

Nothing in this record suggests that plaintiff's disability was used as an aggravating circumstance or otherwise contributed to the JJC's decision to terminate plaintiff. Nor are we persuaded that JJC employee testimony shows defendant acted with retaliatory intent.

We acknowledge that JJC Captain Edwin Gonzalez testified during his deposition that he attended meetings concerning plaintiff's disciplinary action. At one meeting, Mickens was "angry about [plaintiff's] case" and stated, "[i]f that motherf[****]r thinks that he's going to get off this charge, that's bullshit. I'm going to get him. He ain't getting off this damn thing. I'm going to fix this."

We are not persuaded this testimony establishes a pattern of antagonism. However, we must also consider whether this evidence supports a pretext argument related to the incident on July 3, 2016. We note that defendant contends the trial court did not need to address the issue of pretext because "the JJC had no legal obligation to mitigate the severity of [plaintiff's] discipline based on his alleged disability." That may be true, but we decline to disregard plaintiff's pretext argument in light of the testimony about Micken's reaction to plaintiff's case.

As we have noted, the third and final step of McDonnell analysis requires the plaintiff to "show that the reasons advanced by the defendant are a pretext

18

for discrimination." Zive, 182 N.J. at 458. "To prove pretext, a plaintiff may not simply show that the employer's reason was false but must also demonstrate that the employer was motivated by discriminatory intent." Id. at 449 (citing Viscik, 173 N.J. at 14). The statement attributed to Mickens may show that defendant was motivated by an ulterior intent, but not a discriminatory one. Providing plaintiff all permissive inferences, the record does not support that his statement does not discuss or relate to plaintiff's mental health or substance abuse.

VI.

We need only briefly address plaintiff's contention that "the temporal proximity of [his] worker's compensation claim is alone sufficient" to establish the necessary causal link between the protected activity and the adverse employment consequence. As we have noted, temporal proximity alone is not enough to establish the necessary causal link. "The mere fact that [an] adverse employment action occurs after [the protected activity] will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two." Young, 385 N.J. Super. at 467 (quotation marks omitted) (quoting Krouse, 126 F.3d at 503).

A-0123-23

Finally, we address plaintiff's contention that the trial court erred by granting summary judgment in favor of defendant concerning plaintiff's punitive damages claims. Plaintiff argues that defendant acted with actual malice and/or willful and wanton conduct as "numerous members of upper management actively participated and/or were indifferent to the harassment and retaliation that plaintiff suffered" and that active participation was "especially egregious."

The Punitive Damages Act, N.J.S.A. 2A:15-5.9 to -5.17, permits punitive damages where the plaintiff proves by clear and convincing evidence "that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions." N.J.S.A. 2A:15-5.12(a). Typically, conduct that is sufficiently egregious to warrant a punitive damages award must be intentional wrongdoing "in the sense of an 'evil-minded act' or an act accompanied by a wanton and willful disregard of the rights of another." Rendine v. Pantzer, 141 N.J. 292, 314 (1995) (quoting Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 49-50 (1984)). For employer liability, "the employer should be liable for punitive damages only in the event of actual participation by upper management

or willful indifference" and the plaintiff must provide proof that the conduct was "especially egregious." Id. at 313-14.

We acknowledge the JJC employees responsible for plaintiff's termination constitute "upper management." See Cavuoti v. N.J. Transit Corp., 161 N.J. 107, 128-29 (1999). However, plaintiff has failed to establish that the JJC acted with willful indifference or that any conduct was egregious. The JJC employees responsible for plaintiff's termination based their decision on his July 3, 2016 conduct, not his disability.

To the extent we have not specifically addressed them, any remaining contentions raised by plaintiff on appeal lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

21

A-0123-23